CARTER COAL COMPANY, Petitioner-Appellant, v. THE HUMAN RIGHTS
COMMISSION et al., Respondents-Appellees.

Fifth District    No. 5—91—0649

Opinion filed May 2, 1994.

WELCH, J., specially concurring.

A. Courtney Cox, of Hart & Hart, of Benton, for petitioner.

James W. Creason, of Pfaff, Garner & Terlizzi, of Salem, for respondent
Jack Owens.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, So-

licitor General, and Tanya Solov, Assistant Attorney General, of counsel), for respondent Human Rights Commission.

JUSTICE CHAPMAN delivered the opinion of the court:
"State blacklisting laws, enacted largely between 1887 and 1930, were among the first efforts to outlaw retaliatory refusals to hire. These statutes were enacted in about half of the states because employers, in an effort to quash labor organization, created and circulated lists of pro-union workers to prevent them from gaining employment. In reaction, states limited the employer's right to hire and fire at will by prohibiting blacklisting." Rothstein, *Wrongful Refusal To Hire: Attacking the Other Half of the Employment-At-Will Rule*, 24 Conn. L. Rev. 97, 110 (1991).

The principal issue in this case is whether an employer can retaliate against a prospective employee because that employee has filed an age-discrimination charge against a previous employer. We hold it cannot.

Carter Coal Company petitions this court for review of the order of the Illinois Human Rights Commission which denied its petition for rehearing and the order and decision of the Commission which affirmed, in part, the September 18, 1989, recommended order and decision of the administrative law judge. The administrative law judge found in favor of Jack Owens and against Carter Coal Company (Carter Coal) on Owens' complaint of a civil rights violation. The complaint charged that Carter Coal had discharged Owens in retaliation for filing a previous charge of age and handicap discrimination against a former employer. We affirm the orders of the Commission.

On April 4, 1985, Jack Owens filed a charge of discrimination with the Department of Human Rights against Carter Coal Company and Freeman United Coal Mining Company. The claimed charge was that Carter Coal discriminated against him on the basis of age, a perceived physical handicap, and in retaliation for his charge of discrimination against a former employer, Freeman United Coal Mining Company (Freeman United). Owens alleged that the action against Freeman United was pending on January 18, 1985, when Harry Williamson, the president of Carter Coal Company, told complainant that he was hired for the position of belt boss at the company. The complainant further alleged that Peter Helmer, an agent of Carter Coal, contacted Owens that evening at home and asked complainant if he had a lawsuit pending against Freeman United. Owens alleged that he replied affirmatively and that on the following day Mr. Williamson telephoned and told complainant that

he was not hiring him because he did not need a belt boss. Owens alleged that he contacted Mr. Helmer on the evening of January 19, 1985, and was told by Helmer that Williamson had been advised of complainant's discrimination suit against Freeman United and that Williamson would not hire complainant due to that lawsuit. An investigation by the Illinois Department of Human Rights followed.

On August 7, 1987, the Illinois Department of Human Rights filed a complaint which alleged that Owens had filed a charge of discrimination against Freeman United Coal Mining Company on or about April 1, 1984. The complaint further alleged that Carter Coal retaliated against Owens in January 1985 by failing to hire him because he had filed a charge of discrimination against his former employer, in violation of section 6—101(A) of the Illinois Human Rights Act. (775 ILCS 5/6—101(A) (West 1992).) Carter Coal's motion to dismiss the complaint contended that even if it had failed to hire Owens because he had filed a charge of discrimination against a former employer, such conduct would not constitute an act of retaliation within the meaning of section 6—101(A) of the Illinois Human Rights Act. The administrative law judge denied Carter Coal's motion to dismiss, and the matter was set for hearing.

The administrative law judge (ALJ) issued an interim recommended order and decision which sustained Owens' claim that Carter Coal retaliated against him because he had filed the previous charge of discrimination against Freeman United. The ALJ found that the complainant was hired on January 18, 1985, and was terminated by Williamson that same day:

> "The evidence supports a finding that Complainant was hired. It is undisputed that Complainant filed an application with Respondent after Respondent sent a letter requesting him to do so. Also, it is undisputed that Complainant was requested by Respondent to take a pre-employment physical examination with Dr. Gene Stolar, and that Complainant had the examination.
>
> Further, the parties agree that Complainant was interviewed on the morning of January 18, 1985, by Williamson. Complainant testified credibly that during his interview, Williamson wrote down numbers off his mining papers. Additionally, Williamson explained to Complainant his duties, discussed salary and gave Complainant a benefit package which contained, among other things, the salary schedule, company rules and regulations, savings plan, pension plan, travel and accident insurance and the medical plan. Complainant testified further that Williamson shook his hands and welcomed him aboard. Williamson also told Complainant that Helmer would tell him when to report to work and that tax forms should be completed on his first day. The

totality of Williamson's actions certainly establishes that Complainant was hired for a position at Respondent's mine."

The ALJ found that these facts established a *prima facie* case of retaliation.

Carter Coal sought review before the Commission and argued that the ALJ's findings that complainant had been hired on January 18, 1985, and that Carter Coal retaliated by firing complainant that same day were against the manifest weight of the evidence.

On May 22, 1991, the Commission modified the ALJ's award of damages and reinstatement but affirmed the ALJ's determination that Carter Coal retaliated against complainant under section 6—101(A) of the Act. The Commission did not base its ruling on a finding that Carter Coal had hired complainant and then fired him when it found out about the claim against the former employer. The Commission ruled that Owens was denied the job because he had filed a previous charge of discrimination against a former employer and because it was reasonable to infer that Carter Coal did not hire complainant out of a fear that complainant was more likely to file a discrimination charge against Carter Coal because he had filed the earlier claim against Freeman United. Carter Coal's petition for rehearing before the full commission was denied by the Commission, and Carter Coal appealed.

Carter Coal's appeal proceeds on two points. First, Carter Coal argues that only section 2—102 of the Illinois Human Rights Act (Act) (775 ILCS 5/2—102 (West 1992)) covers civil rights violations for failure to hire. Carter Coal's second position is that retaliation for the bringing of a charge or complaint against a former employer is not included as a civil rights violation under section 6—101(A) of the Act.

Turning to the first point, section 2—102 provides that it is a civil rights violation:

"(A) For any employer to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination ***." (775 ILCS 5/2—102 (West 1992).)

The Act defines unlawful discrimination as "discrimination against a person because of his or her race, color, religion, national origin, ancestry, age, sex, marital status, handicap or unfavorable discharge from military service as those terms are defined in this Section." (775 ILCS 5/1—103(Q) (West 1992).) The Act further provides:

"(A) Nothing contained in this Act shall prohibit an employer, employment agency or labor organization from:

(1) *** Hiring or selecting between persons for *bona fide* occupational qualifications or any reason *except those civil-rights violations specifically identified in this Article.*" (Emphasis added.) (775 ILCS 5/2—104(A)(1) (West 1992).)

Carter Coal contends that nothing in the relevant provisions of article 2 outlined above prohibits an employer from refusing to hire a person because the applicant has filed a charge against a former employer. Although we might agree with Carter Coal's construction of article 2, the language of a statute must be reviewed as a whole; each section must be examined in relation to every other section. (*Scadron v. City of Des Plaines* (1992), 153 Ill. 2d 164, 185, 606 N.E.2d 1154, 1163.) A more complete review of the Act reveals that additional civil rights violations are found in article 6 of the Act. Article 6 of the Act, entitled "Additional Civil Rights Violations," sets forth the civil rights violations of retaliation, aiding and abetting, coercion, and interference. Therefore, article 6, section 6—101, of the Act must be examined to determine if it prohibits an employer from refusing to hire a person on the basis that the applicant has filed a charge against a former employer.

Carter Coal contends that the failure to hire a person who has previously filed a charge of discrimination against a former employer is not a violation of the Illinois Human Rights Act. The Company further argues that the finding that it failed to hire complainant because of a fear that he was likely to file a discrimination charge against respondent is against the manifest weight of the evidence. The scope of review of the Commission's decision is limited by section 8—111(A)(2) of the Act, which mandates that "[i]n any proceeding brought for judicial review, the Commission's findings of fact shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence." (775 ILCS 5/8—111(A)(2) (West 1992).) Carter Coal's first argument, however, involves our review of the Commission's interpretation of section 6—101(A) and other relevant provisions of the Illinois Human Rights Act. Interpretation of the relevant statutory provisions is a question of law, and the manifest weight of the evidence standard does not apply to findings of an administrative agency where the question presented is one of law. (*Callahan v. Department of State Police* (1991), 223 Ill. App. 3d 1081, 1085, 586 N.E.2d 381, 384.) Deference is accorded to an agency's interpretation of law in fact situations which have been dealt with in a line of cases over a long period of time and in which the agency's interpretation has been subject to judicial review. (*Walgreen Co. v. Selcke* (1992), 230 Ill. App. 3d 442, 448, 595 N.E.2d 89, 93.) The statutory interpretation involved in the instant case,

however, is one of first impression, and we will thus exercise independent review over the Commission's determination that respondent's actions constituted retaliation under section 6—101(a) of the Act.

Section 6—101(A) of the Illinois Human Rights Act provides:

"*It is a civil rights violation* for a person, or for two or more persons to conspire, *to*:

(A) *** *Retaliate* against a person *because he or she has opposed* that which he or she reasonably and in good faith believes to be unlawful discrimination, sexual harassment in employment or sexual harassment in higher education, *** or because he or she has *made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this Act.*" (Emphasis added.) (775 ILCS 5/6—101(A) (West 1992).)

Carter Coal contends that it is not a violation of section 6—101(A) of the Illinois Human Rights Act for an employer to refuse to hire a person who has previously filed a charge of discrimination against a former employer. Carter Coal argues that no court or agency construed section 6—101(A) of the Act to include an act against an individual because that person has filed a charge against a *former* employer. Carter Coal contends that in order to conclude that it violated section 6—101(A) of the Act it was necessary to show that it *retaliated* against the complainant because he had filed a charge against *it* under the Act, and that the plain meaning of the word "retaliate" does not contemplate refusing to hire a person because that person filed a charge against a former employer. In short, Carter Coal argues that the person must have been fired for bringing a charge or complaint or participated in a human rights proceeding against his or her employer.

Statutory language must be given its plain and ordinary meaning, and a court is not free to restrict or enlarge the plain meaning of an unambiguous statute. (*Scadron v. City of Des Plaines* (1992), 153 Ill. 2d 164, 185, 606 N.E.2d 1154, 1163; *B&W Liquors, Inc. v. Illinois Liquor Control Comm'n* (1981), 96 Ill. App. 3d 413, 415, 421 N.E.2d 396, 397.) While the term "retaliate" is not defined in the Act, Webster's Ninth New Collegiate Dictionary defines it as follows:

"To repay (as an injury) in kind; to return like for like; to get revenge."

Black's Law Dictionary describes retaliation:

"[Retaliation is that] which requires the infliction upon a wrongdoer of the same injury which he has caused *to another*. Expressed in the Mosaic law by the formula, 'an eye for an eye; a tooth for a tooth.' etc. In modern international law, the term describes the rule by which one state may inflict upon the citizens of another

state death, imprisonment, or other hardship, in retaliation for similar injuries imposed upon its own citizens." (Emphasis added.) Black's Law Dictionary 822 (5th ed. 1979).

Given the common usage of the term "retaliate," we find Carter Coal's argument that retaliation under section 6—101(A) does not include conduct by it against Owens for his actions against Freeman United to be without merit. Historical references of global impact come to mind when one thinks of retaliation because of conduct against another party. We should not forget France's and Great Britain's declarations of war on Germany after Germany attacked Poland to begin World War II. Both the Korean War and the Vietnam War involved retaliation for attacks against other countries. Other more recent references include President Bush's Gulf War retaliation against Iraq for its attack on Kuwait and the United Nations' retaliatory air strikes in Bosnia. On a more local level, retaliation for acts against a third party are not unfamiliar. See, *e.g., People v. Tayborn* (1993), 254 Ill. App. 3d 381, 627 N.E.2d 8 (where the defendant intended to harm the victim in retaliation for the victim's having fought with his brother).

In addition, the language of section 6—101(A) indicates that retaliation is possible for a party's acts toward a third party. Section 6—101(A) provides that retaliation is unlawful because someone has opposed discrimination or harassment, made a charge, filed a complaint, or testified, assisted, or participated in an investigation, proceeding, or hearing under the Act. The Act does not state that the person retaliated against had to have opposed, charged, testified, etc., against the retaliating entity in order for the entity's conduct against that person to constitute retaliation. In other words, there need not be a previous connection between the actor and the recipient outside of the retaliatory conduct.

To establish a *prima facie* case of retaliation under the Act, a plaintiff employee must show that (1) he or she engaged in a protected activity; (2) the employer committed an adverse act against him or her; and (3) a causal nexus existed between the protected activity and the adverse act. (*Maye v. Illinois Human Rights Comm'n* (1991), 224 Ill. App. 3d 353, 360, 586 N.E.2d 550, 555, citing *Burton & Illinois Bell Telephone Co.* (1985), 17 Ill. H.R.C. Rep. 21, 29; see also *Thomas & Merrill Dow Pharmaceutical* (1984), 14 Ill. H.R.C. Rep. 81, 82.) The requirement of a causal nexus between the protected activity and the adverse act does not require the plaintiff to have engaged in a protected activity which directly affected the retaliating entity.

Our interpretation of the Act leads us to conclude that a cause of action may be established if an employer refuses to hire a person

because that person has previously filed a charge of discrimination against a former employer. We find that recent case law and current public policy support such an interpretation.

At this juncture we turn to the history of the employment-at-will doctrine. The purpose of this detour is to examine the employment-at-will rule and the development of exceptions to it. We begin by noting that, in this country, the employee was considered to be the servant of the master and could be discharged at any time without cause or notice. (Klinedinst, *Workplace Claims: Trends in Wrongful Termination and Common Law Workplace Claims* (hereinafter *Workplace Claims*), 476 PLI/Lit. 275, ___ (1993).) This conception was coined the "American Rule" by Horace Wood:

> "With us, the rule is inflexible that a general or indefinite hiring is *prima facie* a hiring at will, and if the servant seeks to make it out a yearly hiring, the burden is upon him to establish it by proof." (H. Wood, Master and Servant § 134, at 272 (1877).)

Under the "English Rule," the presumption of a yearly hiring required the employer to introduce evidence that the parties intended a shorter term. 1 L. Larson & P. Borowsky, Unjust Dismissal § 2.04, at 2—6 (1989).

With the passage of the National Labor Relations Act of 1935, inroads were made into the employment-at-will doctrine, and employees gained bargaining strength and job security through union representation and the collective bargaining process. (Klinedinst, *Workplace Claims*, 476 PLI/Lit. 275, ___ (1993).) The Act not only provided that employees could not be fired for union activity, but it also protected the right of employees to bargain collectively for contracts securing better wages, hours, and working conditions. Klinedinst, *Workplace Claims*, 476 PLI/Lit. 275, ___ (1993).

The at-will employment relationship was further eroded with the passage of Federal and State legislation prohibiting discrimination in employment on the basis of race, color, religion, sex, national origin, age, or handicap. See 42 U.S.C. § 2000e (1982) (the current version of Title VII of the Civil Rights Act of 1964); see also 775 ILCS 5/1—101 *et seq.* (West 1992) (the Illinois Human Rights Act).

While it is apparent that the legislative branch has chipped away at the employment-at-will doctrine, the judiciary has made inroads as well. (See 1 L. Larson & P. Borowski, Unjust Dismissal § 2.06, at 2—13 (1989).) In 1959, *Petermann v. International Brotherhood of Teamsters* (1959), 174 Cal. App. 2d 184, 344 P.2d 25, held that an at-will employee could maintain an action for breach of contract when he alleged that he had been fired for refusing to commit perjury. The court stated that at-will employees could generally be discharged for

"any reason whatsoever," but the court noted that "the right to discharge an employee under such a contract may be limited by statute [citation] or by considerations of public policy." It found that Petermann's discharge violated a clear State policy against the subornation of perjury:

> "The public policy of this state *** would be seriously impaired if it were to be held that one could be discharged by reason of his refusal to commit perjury. To hold that one's continued employment could be made contingent upon his commission of a felonious act at the instance of his employer would be to encourage criminal conduct upon the part of both the employee and employer and would serve to contaminate the honest administration of public affairs. This is patently contrary to the public welfare." *Petermann*, 174 Cal. App. 2d at 188-89, 344 P.2d at 27.

In Illinois, the act of retaliatory discharge was first recognized in *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353, in which the plaintiff alleged that she was fired in retaliation for filing a workers' compensation claim. The employer did not deny that was the motive for her discharge, but the employer argued that it could discharge an at-will employee for any reason. The Illinois Supreme Court rejected this argument and held that a private cause of action for redress of retaliatory discharges was necessary to effectuate the important public policy expressed in the compensation statute:

> "The Workmen's Compensation Act [Ill. Rev. Stat. 1975, ch. 48, par. 138.1 *et seq.*], in light of its beneficient purpose, is a humane law of a remedial nature. [Citation.] It provides for efficient remedies for and protection of employees and, as such, promotes the general welfare of this State. Consequently, its enactment by the legislature was in furtherance of sound public policy. [Citation.] We are convinced that to uphold and implement this public policy a cause of action should exist for retaliatory discharge." (*Kelsay*, 74 Ill. 2d at 181, 384 N.E.2d at 357.)

In *Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 421 N.E.2d 876, the supreme court held that a cause of action for retaliatory discharge was stated by an employee who alleged that he was fired after agreeing to assist in a criminal investigation into certain activities of a coemployee. Thus, the court recognized that an action for retaliatory discharge could be made outside the Workmen's Compensation Act. The *Palmateer* court discussed the two elements of a retaliatory discharge action. First, the employer must discharge the employee in retaliation for the employee's activities. Second, the discharge must contravene a clearly mandated public policy.

*Kelsay* involved a policy which directly benefited employees, while *Palmateer* involved a policy which benefited society as a whole. Thus,

protection for employees can be based on different public policy grounds. (Loseman, *Unraveling the Illinois Retaliatory Discharge Tort*, 1989 U. Ill. L. Rev. 517, 528.) We would be remiss not to mention other cases where protection from retaliatory discharge has been afforded on public policy grounds. For instance, in *Wheeler v. Caterpillar Tractor Co.* (1985), 108 Ill. 2d 502, 485 N.E.2d 372, the supreme court found that the employee was wrongfully discharged where he refused to work with a unit which utilized live radioactive cobalt in violation of Federal regulations.

> " 'There is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens.' [Citation.] The protection of the lives and property of citizens from the hazards of radioactive material is as important and fundamental as protecting them from crimes of violence, and by the enactment of the legislation cited, Congress has effectively declared a clearly mandated public policy to that effect." (*Wheeler*, 108 Ill. 2d at 511, 485 N.E.2d at 377.)

The *Wheeler* court noted that a Federal statute could affect Illinois public policy. By recognizing a Federal source, the court established that Illinois statutes, cases, and constitutional provisions did not comprise the only sources of public policy. Loseman, *Unraveling the Illinois Retaliatory Discharge Tort*, 1989 U. Ill. L. Rev. 517, 523.

Other instances of the recognition of retaliatory discharge claims based on public policy are found in *Petrik v. Monarch Printing Corp.* (1982), 111 Ill. App. 3d 502, 444 N.E.2d 588, *Johnson v. World Color Press, Inc.* (1986), 147 Ill. App. 3d 746, 498 N.E.2d 575, and *Zimmerman v. Buchheit of Sparta, Inc.* (1993), 245 Ill. App. 3d 679, 615 N.E.2d 791, *appeal allowed* (1993), 152 Ill. 2d 582, 622 N.E.2d 1230. In *Petrik* the court held that a cause of action for retaliatory discharge could be brought by an employee who was discharged for complaining internally of wrongs and possible criminal conduct which, though not violative of the criminal law, were nonetheless violations of public policy. *Johnson v. World Color Press, Inc.* involved disputed accounting practices and allegations of Federal law violations. Johnson was allegedly fired in retaliation for objecting to certain of the company's accounting practices, which he claimed constituted violations of Federal securities laws. The court held that he stated a claim for retaliatory discharge because violating Federal security laws involved a clearly mandated public policy of national scope. In *Zimmerman v. Buchheit of Sparta, Inc.*, the court held that a complaint alleging that the defendant employer demoted plaintiff and reduced her work time in retaliation for her election to exercise her rights under the Workers' Compensation Act stated a cause of action. For a recent

case recognizing a cause of action for retaliatory discharge based on public policy grounds, see *Paskarnis v. Darien-Woodridge Fire Protection District* (1993), 251 Ill. App. 3d 585, 623 N.E.2d 383 (discharge of plaintiff for speaking out against the lack of training of part-time firefighters contravenes clearly mandated public policy).

It is not surprising that the common law tort of retaliatory discharge has expanded beyond the workers' compensation arena. The Illinois Constitution provides that "[a]ll persons with a physical *** handicap shall be free from discrimination *** unrelated to ability in the hiring and promotion practices of any employer." (Ill. Const. 1970, art. I, § 19.) In addition, one need only scan the Illinois statutes to see the myriad of laws prohibiting an employer from retaliating against the employee for one reason or another. See, *e.g.*, 740 ILCS 170/10 (West 1992); 735 ILCS 5/12—818 (West 1992) (providing that an employee may not be discharged because his wages have been garnished); see also 720 ILCS 510/13 (West 1992) (prohibiting disciplinary action against one who refuses to participate in the performance of abortions); 745 ILCS 70/5 (West 1992) (prohibiting discrimination because of a conscientious refusal to receive or participate in any particular form of medical care that is contrary to his or her conscience); 705 ILCS 305/4.1 (West 1992) (protecting employees from discharge for taking time off for jury duty); 725 ILCS 125/8 (West 1992) (prohibiting an employee from being discharged when subpoenaed as a witness to a crime); 820 ILCS 115/14 (West 1992) (prohibiting discharging an employee who brings a claim under the State's wage and hour law).

Although Illinois has recognized various public policy reasons to support claims of retaliatory discharge, the Illinois courts continue to follow the at-will rule of discharge unless the discharge violates a clearly mandated policy. For instance, in *Barr v. Kelso-Burnett Co.* (1985), 106 Ill. 2d 520, 478 N.E.2d 1354, the plaintiffs alleged that they had been discharged in derogation of their rights to free speech. The court rejected their claim, stating, "the common law doctrine that an employer may discharge an employee-at-will for any reason or for no reason is still the law in Illinois, except when the discharge violates a clearly mandated public policy." (*Barr*, 106 Ill. 2d at 525, 478 N.E.2d at 1356.) Other cases where claims for retaliatory discharge have been rejected include: *Buechele v. St. Mary's Hospital Decatur* (1987), 156 Ill. App. 3d 637, 509 N.E.2d 744 (plaintiff's allegation that she was discharged in retaliation for filing a complaint against her employer was rejected, where the court held that the right to file a lawsuit claiming individual injury is a purely personal right and does not involve clearly mandated public policy); *Gould v.*

*Campbell's Ambulance Service, Inc.* (1986), 111 Ill. 2d 54, 488 N.E.2d 993 (where the court rejected a claim because the city ordinance setting ambulance-worker requirements did not establish State public policy); *McCluskey v. Clark Oil & Refining Corp.* (1986), 147 Ill. App. 3d 822, 498 N.E.2d 559 (court rejected retaliatory discharge claim that plaintiff was discharged solely because she married a co-worker, the court finding that the law on marriage did not provide a basis for a public policy exception to the at-will rule); *Zaniecki v. P.A. Bergner & Co.* (1986), 143 Ill. App. 3d 668, 493 N.E.2d 419 (court held plaintiff's discharge involved a purely private dispute rather than public policy, where plaintiff reported that the store's manager was taking scrap wood from shipping containers for personal use); *Cipov v. International Harvester Co.* (1985), 134 Ill. App. 3d 522, 481 N.E.2d 22 (a complaint alleging that an at-will employee was terminated for failure to take a polygraph examination); and *Thomas v. Zamberletti* (1985), 134 Ill. App. 3d 387, 480 N.E.2d 869 (plaintiff who was discharged after he was injured in an auto accident and failed to report to work on time did not state a retaliatory discharge claim as the discharge did not violate a public policy in favor of providing medical care to injured persons).

Since *Kelsay*, one of the most important areas of wrongful discharge litigation in Illinois has been that involving workers' compensation claims. (1 L. Larson & P. Borowsky, Unjust Dismissal § 10.14[2], at 10—88.8 (1991).) In the context of workers' compensation retaliatory discharge actions, a cause of action has been recognized against one's current employer if that employer discharges an employee because the employee filed a workers' compensation claim against a previous employer. (See *Darnell v. Impact Industries, Inc.* (1984), 105 Ill. 2d 158, 473 N.E.2d 935.) In *Darnell* the defendant contended that a retaliatory discharge action existed only if the workers' compensation claim and the discharge involved the same employer and employee. In other words, the employer argued that the plaintiff's discharge by defendant because of a claim against a prior employer was not violative of the clearly mandated public policy recognized by *Kelsay*. The supreme court disagreed:

> "We perceive no distinction between the situation where an employee is discharged for filing a workers' compensation claim against the defendant employer and one where the employer discharges the employee upon discovering that the employee had filed a claim against another employer. In either situation a retaliatory discharge is equally offensive to the public policy of this State as stated in the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.4(h)). To hold that the tort of retaliatory dis-

charge requires that the workers' compensation claim be made against the discharging employer would seriously undermine the comprehensive statutory scheme which provides 'for efficient and expeditious remedies for injured employees.' " (*Darnell*, 105 Ill. 2d at 161-62, 473 N.E.2d at 937, quoting *Kelsay*, 74 Ill. 2d at 182, 384 N.E.2d at 357.)

*Darnell* recognized that a retaliatory discharge action could be maintained against a current employer which discharged an employee for activities that took place between that employee and an earlier employer. The supreme court's recognition of the need for protection of workers who have filed workers' compensation claims is a reflection of reality.

"The risk that a future employer will refuse to hire applicants who, for example, filed workers' compensation claims while working for a prior employer is more than theoretical or isolated. Private consulting companies have compiled huge data bases of claims filed by workers. One such company reportedly has records on 7.5 million workers. A preemployment computer search, which costs only about five dollars per applicant, enables a company to avoid hiring people who are 'accident prone' or 'claim happy.' Obviously, other applicants are also effectively screened out, including those who have worked in a hazardous industry and those who have worked for an employer without a strong commitment to safety and health. Moreover, there are reports of employers threatening injured workers that if they filed a workers' compensation claim, their names will be 'put in the computer' and they will be unable to get another job.

It is possible that many other data bases could be created or may already exist to compile health insurance claims, tort or contract suits, civil rights complaints, and other matters. *If filing a claim meant that an individual would have great difficulty in obtaining another job, the exercise of basic statutory rights by employees would be more than chilled—it would be frozen.*" (Emphasis added.) Rothstein, *Wrongful Refusal to Hire: Attacking the Other Half of the Employment-At-Will Rule* (hereinafter *Wrongful Refusal to Hire*), 24 Conn. L. Rev. 97, 120-21 (1991).

This review indicates that the employment-at-will doctrine has evolved from one of absolute protection for the employer to one of flexible application if flexibility is necessary to protect employees or the public at large and if strongly mandated public policy issues are involved. Suffice it to say, we hold that an employer can be liable for a retaliatory refusal to hire if it refuses to hire a prospective employee in retaliation for that employee's earlier exercise of his or her right to protection under the Illinois Human Rights Act.

Section 6—101(A) affords a remedy to individuals who have been victims of retaliation. The statute does not say that the retaliation claim must have been for an act committed against the retaliating employer. *Darnell v. Impact Industries, Inc.* (1984), 105 Ill. 2d 158, 473 N.E.2d 935, recognized that it is a violation of public policy for an employer to discharge an employee in retaliation for the employee's exercise of the protected right of filing a workers' compensation claim against a prior employer. Logical consistency requires application of the holding of *Darnell* to a situation involving an employee's exercise of the protected right of filing a discrimination claim against a previous employer. A policy that is undermined when an employer discharges a current employee is also undermined when a subsequent employer refuses to hire the same person. (Rothstein, *Wrongful Refusal To Hire*, 24 Conn. L. Rev. at 120.) We find, therefore, that the Commission did not err in finding in favor of Owens on his claim for retaliatory refusal to hire.

Parenthetically, we note that because the Illinois Human Rights Act is significantly similar to the Federal Civil Rights Act of 1964 (see 42 U.S.C. § 2000e *et seq.* (1982)), the Illinois courts often consult and rely upon the Federal law. We noted at the outset that this case presents an issue of first impression in Illinois; thus, turning to the Federal arena for guidance is appropriate. See *Schoneberg v. Grundy County Special Education Cooperative* (1979), 67 Ill. App. 3d 899, 905, 385 N.E.2d 351, 357 (the Federal experience can serve as a useful guide for determining whether discrimination violates Illinois law).

In the Federal realm, failure-to-hire claims are recognized, if such claims are based upon the statutory provision which specifically prohibits discrimination against an employee for filing an Equal Employment Opportunity Commission complaint. (See *Ruggles v. California Polytechnic State University* (9th Cir. 1986), 797 F.2d 782, 786; *Berry v. Stevinson Chevrolet* (D. Colo. 1992), 804 F. Supp. 121; 42 U.S.C. § 2000e—3(a) (1982).) Moreover, 42 U.S.C. § 1981 (1982) protects the individual against discrimination in the making of contracts, thus statutorily recognizing a failure-to-hire cause of action. (See *Robinson v. N&C Construction Co.* (N.D. Ohio 1991), 767 F. Supp. 843; *Smith v. Continental Insurance Corp.* (D.N.J. 1990), 747 F. Supp. 275, *aff'd* (3d Cir. 1991), 941 F.2d 1203.) Although the Federal retaliatory failure-to-hire cases are not controlling in this case as the Federal cause of action is based upon statutory language which specifically prohibits retaliation, the Federal statute and cases are still helpful because (1) they recognize a strongly mandated public policy in this area, and (2) Illinois recognizes congressional acts as a source of public policy. See *Wheeler v. Caterpillar Tractor Co.* (1985), 108 Ill. 2d 502, 485 N.E.2d 372.

We note that the finding of retaliation in the Commission's order and decision of May 22, 1991, was based not merely upon a refusal to hire because of knowledge of complainant's prior charge of discrimination against a previous employer but also upon Carter Coal's fear that the complainant would, if employed, exercise his rights under the Illinois Human Rights Act against Carter Coal. Carter Coal contends that the Commission's finding that it failed to hire Owens because of a fear that he was likely to file a discrimination charge against Carter Coal was against the manifest weight of the evidence. We decline to address the manifest weight issue, however, in light of our determination that Jack Owens established retaliation under section 6—101(A) of the Act by proving that Carter Coal Company refused to hire him because Owens had previously filed a charge of discrimination against a former employer.

Ordinarily we would end this opinion at this point. However, because of the importance of the issues involved, we will proceed to discuss an alternative basis for this decision. The Commission did not find that complainant had been discharged, only that he had not been hired. As mentioned earlier in our discussion of the facts, in her interim recommended order and decision, the ALJ found that Owens *was hired* on January 18, 1985, and then discharged. In its order and decision, the Commission stated:

> "The respondent argues that the factual findings of Judge Miller which lead to her conclusion of liability are against the manifest weight of the evidence. \*\*\*
>
> \*\*\* Where there is a question of credibility between two witnesses both of whom appear to be credible, it is emphatically the job of the ALJ to determine who is telling the truth. If the Commission were to accept the respondent's exceptions, we would merely be saying that ALJ Miller believed the wrong party. Under the manifest weight standard of review, we are prohibited from second-guessing the ALJ in that manner based upon a cold record. The respondent's exceptions with respect to manifest weight are, therefore, rejected."

Inexplicably, after rejecting Carter Coal's manifest-weight challenge to the ALJ's fact findings, the Commission then concludes that the ALJ found that Owens was not hired but "had been denied a job in retaliation for his having filed a previous charge of discrimination." The ALJ had not made any such finding; she had found that Owens had been *hired* and *fired*.

The Illinois Human Rights Act limits our function to determining whether the final decision of the Commission is against the manifest weight of the evidence. (775 ILCS 5/8—111(A)(2) (West 1992); *Vidal*

*v. Illinois Human Rights Comm'n* (1991), 223 Ill. App. 3d 467, 585 N.E.2d 133.) However, we are aware of no authority which would prohibit us from looking beyond the manifest-weight standard where a review of the record demonstrates that the Commission fully intended to adopt the ALJ's findings of fact and then erroneously stated what those findings of fact were. As pointed out, the ALJ found that Owens was hired and then discharged. The Commission expressly adopted the ALJ's findings of fact only to then state the ALJ concluded that Owens "had been denied a job."

We note that Jack Owens' brief on appeal describes the facts as denoted by the ALJ: that Owens was hired and then discharged because he filed a charge under the Act. The Commission based its determination on a factual finding that Owens was not hired but was refused employment. Suffice it to say, our decision in this case would have been the same if Carter Coal had hired and then discharged Owens. The same analysis would apply to both factual findings.

On another note, we are aware that this court recently held that a complaint which alleged that an employee was discharged because his employer feared that he might file a workers' compensation claim in the future did not state a cause of action for retaliatory discharge. (*Wieseman v. Kienstra, Inc.* (1992), 237 Ill. App. 3d 71, 604 N.E.2d 1126.) We conclude that *Wieseman* can be distinguished from this case for three reasons.

First, we are not deciding this appeal on the second prong of the Commission's decision, *i.e.*, that it was improper to refuse to hire Owens because he might file a discrimination case in the future, a holding that might be in conflict with the majority's decision in *Wieseman*. We have affirmed the first prong of the Commission's decision, that it was a violation of the Act to refuse to hire Owens in retaliation for the fact that he had filed an earlier claim of discrimination.

Second, the majority in *Wieseman* relied upon the following facts: "[Plaintiff] does not relate any activity he performed which provided the defendant with a retaliatory motive for his discharge. He does not state that he filed a workers' compensation claim against his former employer or against the defendant ***." (*Wieseman,* 237 Ill. App. 3d at 723-24, 604 N.E.2d at 1129.) The absence of activity in *Wieseman* distinguishes it from the undisputed filing of the earlier discrimination claim in this case.

Third, the majority in *Wieseman* relied upon the necessity of an injury as a prerequisite for the policy of protection to be called into play in the workers' compensation setting. It is not injury relief but freedom from discrimination that is the protected activity under the Illinois Human Rights Act. Therefore, the retaliation for the filing of an earlier claim is sufficient; no new injury is required.

In conclusion, we hold that "retaliation" in section 6—101(A) of the Illinois Human Rights Act includes the refusal to hire or the discharge of a person because that person had filed a discrimination charge against another entity. Therefore, the May 22, 1991, order and decision of the Illinois Human Rights Commission and the September 6, 1991, order denying rehearing thereof are affirmed.

Affirmed.

GOLDENHERSH, J., concurs.

JUSTICE WELCH, specially concurring:

I concur in the majority opinion but only to the extent that it holds that plaintiff established retaliation under section 6—101(A) of the Act by proving that Carter Coal Company *discharged* him because he had previously filed a charge of discrimination against a former employer. As the majority points out in discussing its alternative basis for its decision, the record on appeal demonstrates that the Commission fully intended to adopt the findings of fact of the ALJ, that is, that plaintiff was hired and discharged by Carter Coal Company, but the Commission erroneously stated that plaintiff had been denied employment by Carter Coal Company. In its order and decision, the Commission adopted the findings of the ALJ. The ALJ found that plaintiff had in fact been hired and then discharged by Carter Coal Company. Accordingly, I would affirm the decision of the Commission only on the "alternative basis" presented by the majority, that is, that plaintiff was discharged by Carter Coal Company because he had previously filed a charge of discrimination against a former employer.